HANNAH E. SHARP, Appellee, v. J. L. Betts, Appellant.

**Real property:** CONTRACTS: CONSIDERATION: VALIDITY. Following a
district court decree giving plaintiff a one-sixth interest in her
father's estate and ordering partition, the plaintiff and defendant
entered into a joint agreement to purchase the property, plaintiff
to have a one-sixth and defendant a five-sixths interest. Pending
an appeal from the decree of the district court plaintiff transferred
her interest in the estate and all rights under the purchase to defend-
ant, and he gave her back a contract in which he agreed to reconvey
to her the one-sixth interest upon being reimbursed his expenses. On
the appeal, of which defendant had knowledge, the cause was reversed
and plaintiff's one-sixth interest in the property under the decree
terminated. *Held*, that plaintiff acquired a one-sixth interest by
virtue of her contract with defendant and of the purchase at the
partition sale, notwithstanding the reversal of the decree, and that
the contract was not void for misrepresentation or failure of con-
sideration, and that upon reimbursing defendant plaintiff was
entitled to a reconveyance of the one-sixth interest under the
contract.

*Appeal from Polk District Court.*—HON. CHAS. S. BRADSHAW,
Judge.

Saturday, March 14, 1914.

Action for specific performance of a contract. A general denial and various affirmative defenses were interposed by the defendant. There was a decree for the plaintiff, and the defendant appeals.—*Affirmed.*

*Dale & Harvison,* for appellant.

*R. O. Brennan* and *James M. Parsons,* for appellee.

Evans, J.—The parties to this case are brother and sister. The petition declared upon an agreement to convey an interest in real estate and averred the same to be both oral and written. The defendant pleaded a general denial; and pleaded affirmatively the statute of frauds, the statute relating to trusts, and false representation and failure of consideration. The written contract pleaded is sufficient in its terms to entitle the plaintiff to the relief prayed unless it is affirmatively avoided on some of the grounds pleaded. We shall have no occasion therefore to deal with the question of trusts or the statute of frauds. And this is the theory adopted by the briefs; little or no attention being paid to those subjects.

After a recital of a considerable history by way of preamble, the contract sued on provides as follows:

Now therefore, in consideration of the premises, and to the end that the relative rights and interest of the respective parties to this contract may be fully established and determined, the said J. L. Betts hereby agrees that in the event that the said Hannah E. Sharp heirs, administrators or assigns, shall pay or cause to be paid to the said J. L. Betts, heirs, administrators or assigns, any and all moneys now, heretofore and hereafter paid by the said J. L. Betts for the use and benefit and on account of the said Hannah E. Sharp, and shall fully reimburse the said J. L. Betts for any and all such moneys, then and in that event the said J. L. Betts hereby agrees to execute and deliver to the said Hannah E. Sharp

by good and sufficient deed an undivided one-sixth interest in and to the J. L. Betts farm described as follows: The north fractional half of the N. W. ¼ of section one, containing 95.17 acres, less the right of way of the Des Moines and Minneapolis Railway Company; also the north fractional half of the N. E. ¼ of section two containing 96.28 acres less the west 15 acres thereof; all in township 79, north, range 24, west of the 5th P. M., Iowa. The intention being that the quitclaim deed heretofore executed by Hannah E. Sharp and David Sharp to J. L. Betts is for security only for money now heretofore or hereafter advanced by the said J. L. Betts and so advanced by him to protect the interest of the said Hannah E. Sharp in and to her father's estate as above referred to and set forth.

The prayer of plaintiff's petition was that the defendant be required to convey to her the undivided one-sixth interest in the premises described. The contract bears date of March 31, 1905. In addition to his general denial, the defendant set forth the following affirmative defenses:

Par. 4: For further answer, defendant respectfully shows to the court that the contract of March 31, 1905, referred to as 'Exhibit A' in the petition, is of no force or validity for the following reason: Prior to the execution of the same, and for the purpose of inducing the defendant to enter into the same, the plaintiff represented to defendant that she was the owner in fee simple of an undivided one-sixth part of the real estate embraced therein, subject only to a lien in favor of one S. W. Betts for the sum of about $1,333.67, and a certain attorneys' lien in favor of her attorneys, McLennan & Brennan; that defendant relied upon said representations and believed them to be true, and, so relying and believing, was induced thereby to enter into said 'Exhibit A,' and but for said representations would not have entered thereinto; that, as a matter of fact, said representations were not true, but on the contrary plaintiff had no right, title, or interest, of any kind or nature whatsoever, in said premises or any part thereof and had held no interest therein subsequent to the conveyance of same by her by warranty deed to said S. W. Betts on November 16, 1900; that because thereof, the supposed consideration to him for entering into said 'Exhibit A' has en-

tirely failed; all of which will more fully and at length ap-
pear from reference to the record in said cause of *S. W. Betts
et al. v. J. L. Betts et al.*, No. 10,758 equity, of the records of
this court, including particularly the record in the Supreme
Court therein, embracing the opinion of said Supreme Court,
for which see 132 Iowa, 72, and the final decree of this court
in conformity therewith, of date February 7, 1907, and found
in journal 80 at page 107.

The full significance of this defense involves considerable
history. The parties hereto are two of the six children and
heirs of Jeremiah Betts. The latter died prior to 1904, leav-
ing a farm of about one hundred and seventy-five acres in
Polk county. The purported will was set aside, and the title
to the farm was cast upon the six children in equal shares.
Hannah Sharp executed a quitclaim deed of her interest to
her brother Shepherd. Later a suit for partition was insti-
tuted wherein Shepherd Betts claimed to be the owner of two
shares. Hannah appeared in such suit and averred the deed
from herself to Shepherd was given as security only for money
loaned. The trial court sustained her contention and estab-
lished her deed as a mortgage, and found the amount due
thereon from her to Shepherd to be $1,333, and required her
to pay the same in ninety days. This decree was entered in
November, 1904. The same decree ordered partition and ap-
pointed referees to make a sale. Hannah complied with the
decree of the trial court and paid in to the clerk the sum of
$1,333 for the use of Shepherd. Shepherd, however, refused
the deposit and appealed from the decree to this court. The
defendant J. L. Betts aided his sister Hannah in procuring the
necessary amount of $1,333 to save the benefits of the decree
in her favor. The date of sale was fixed and published by the
referees as March 8, 1905. It appears from the evidence on
both sides that Hannah and the defendant (known in this
record as Jerry) had a mutual understanding, looking to the
forthcoming sale of March 8th, that they would try to buy
the farm at such sale and that each would work for the

joint benefit of both. The basis of their joint interest was to be one-sixth to the plaintiff and the remainder to the defendant. At the sale, Hannah made the last and highest bid, $130.50 per acre, and the property was knocked off to her by the referees. Some time between this date of March 8th, and March 31st, the date of the contract sued on, she assigned all her rights under her bid to her brother Jerry for a nominal consideration of one dollar.

It is the contention of Jerry at this point that Hannah was bidding as agent for him, and that the assignment was made in fulfillment of her duty as such agent. This is denied by Hannah. The contention is not very material. If it were, we would have to find that the circumstances quite contradict it. The principal bidders at the sale were Shepherd and Jerry and Hannah. Jerry put in many bids, and Hannah but few. Jerry's last bid was $129 and that of Shepherd was $130. Hannah put in her final bid against the wish and judgment of Jerry, and he rebuked her for it immediately after the property was knocked off to her. The property had been appraised at only $80 per acre. The reason for their special desire to acquire the property was that they had become very hopeful, though not certain, that valuable coal deposits lay under the land. The intuition of Hannah proved stronger than that of Jerry, and it struck the high note which won the prize, as will hereinafter appear. The total purchase price was about $22,800, each share amounting to about $3,800. The winning bid having been accepted, Hannah and Jerry as the purchasing parties were confronted with an uncertain problem of financing the purchase. The financial undertaking rested more heavily upon Jerry than upon Hannah, because his credit was the better and his interest in the undertaking the larger. Before the referees' sale was had, they had already reached an understanding with Mrs. Lacy, one of the heirs, that she would accept certain security in lieu of a large portion of the money which would be due her as her share. This left the shares of the other three heirs in the

proceeds to be paid in money. The purchased farm was deemed abundant security for a sufficient loan to meet such payments. Their original plan, however, met its first obstruction at this point when it was discovered that the pendency of the appeal to this court by Shepherd in the suit between him and Hannah made it necessary that the full proceeds of the sale of such share should be sequestered and put on deposit with the clerk of the district court to await the determination of the appeal in this court. This made ·it necessary to add nearly $2,500 to the deposit of $1,333 which had been previously made in compliance with the decree of the district court. An application for a loan upon the farm for $12,500 had to be changed to one for a loan for $16,000. The application, however, was successful, and such loan was secured from one Carney acting for the Saylor Coal Company. At the same time a contract was entered into with Carney for his company, whereby the $3,800 deposit with the district court was assigned to him as additional security for the loan, the assignment being, of course, subject to the rights of Shepherd therein, whatever such rights might prove to be in the pending litigation. At the same time, also, a contract was entered'into with Carney for his company, whereby Carney purchased an option to mine the coal, if any, underlying said farm. Briefly stated, Carney was to have the right to prospect for coal for a period extending to September 15th following, at the expiration of which time he was entitled to give notice of his election to purchase the coal underlying at $200 per acre.

These contracts with Carney were entered into on April 10th. Before September 15th, Carney elected to exercise his option. This election was followed by a final contract between the parties, whereby Carney bought the coal rights underlying 80 acres of the farm for $16,000; the purchase price being applied to the extinguishment of the mortgage. The contract further provided that Carney should purchase the coal rights under the remainder of the farm at the same rate,

and that such price should be paid as fast as the coal was mined, except that payment for the same should begin not later than January 1, 1907, and that such payments should not aggregate less than $2,500 per year. This contract was entered into on September 23, 1905, and so far as appears in the record was in due time fully performed. The contracts with Carney purported to be between Carney and Jerry alone, but a number of instruments were executed by Hannah also in aid of the contracts and with a view of giving to Carney a priority of lien and right over any outstanding interest of hers. The referees' deed to Jerry was executed on April 8th. Some other complications arose affecting the rights of Hannah. An attorney's lien was filed against her. This was adjusted by the substitution of other security. One Harding, a creditor, after the entry of the decree in her favor in the district court, levied upon her one-sixth interest in the land and sold the same under execution for about $400. This was adjusted on April 12, 1905, by contract signed by Hannah and Jerry and Harding, whereby Hannah and Jerry assigned to Harding "a sufficient amount of the sum and sums of money due and payable to them or either of them for the sale of coal under the land," etc.; the same to be deemed "an assignment of the first payment for coal taken from said premises to the amount of $450," and whereby Harding assigned and transferred to Jerry the said judgment and sheriff's certificate.

It will be noted that the contract sued on was entered into prior to the execution of the referees' deed and prior to the execution of the mortgage to Carney and prior to the coal contract and prior to the various complications which are here referred to. Thereupon, on April 12th, Jerry and Hannah entered into another writing between themselves, wherein these various matters were recited, and whereby the contract of March 31st was confirmed in express terms.

It may be advantageous at this point to pause for a moment in the recital of the history of the enterprise undertaken by these parties, and to look at the situation as it was on

September 23, 1905, when the final contract was entered into
with Carney for the coal company. The net result of the
various transactions was that the coal underlying the land
had been sold for $35,000. Subject to these coal rights, the
ownership of the farm still remained in Jerry and Hannah.
Shepherd's appeal in his suit with Hannah was still pending in
this court. The amount involved in such appeal was $3,800,
and this was on deposit in the district court.. Of this amount
Hannah was tendering $1,333 as the amount due Shepherd.
The real controversy therefore was over the remaining $2,500.
Jerry had no direct interest in the appeal. He had an indirect
interest therein, in that, if Hannah was successful, the $2,500
in dispute would thereby become available for the payment of
debts of Hannah for which Jerry had become guarantor or
surety.

Turning now to the affirmative defense of false representa-
tion and failure of consideration which was pleaded by Jerry
in the case at bar and which we have above set forth, it may
be noted here that it is based upon events which transpired
after September 23, 1905, and after success accomplished.

We proceed with the history: In April, 1906, an opinion
was handed down by this court reversing the decree of the dis-
trict court on the appeal of Shepherd. The effect of this re-
versal was to wholly defeat Hannah in her controversy with
Shepherd and to entitle Shepherd to take the full proceeds of
the one-sixth share which she had previously conveyed to him.
In other words, the $3,800 deposit went to Shepherd entirely,
and Hannah was loser to the extent of $2,500 as compared with
what she would have taken under the decree of the district
court. The allegation of defendant's affirmative defense that
Hannah represented to him when they entered upon the joint
venture that she was the owner of one-sixth of the farm as the
heir of her father is based wholly upon the fact that both Han-
nah and Jerry relied upon the decree of the district court and
believed her to be such owner. The allegation of falsity of
representation is based wholly upon the fact that such decree

of the district court was subsequently reversed by this court
in April, 1906. The allegation of failure of consideration is
based upon the same fact. The contention in argument is that
the one-sixth interest which Jerry agreed to convey to Hannah
was the identical one-sixth interest which she took as heir
of her father and which she had conveyed to Jerry by quitclaim
deed on February 28th. This, however, is a matter of mere
words. It is to be conceded that in all their negotiations to-
gether both Hannah and Jerry assumed that prior to the parti-
tion sale she was the owner of one-sixth interest in said farm
as heir of her father, and this assumption runs through the
various instruments executed by them. But the referees' sale
in partition necessarily extinguished the title of all the heirs
to their interest and conferred the full title upon the pur-
chaser. Hannah was entitled to bid and to purchase at the
referees' sale, regardless of whether she were an heir or not,
and regardless of the outcome of Shepherd's appeal. Jerry
knew every fact in relation to such appeal as fully as she did.
The contract of March 31, 1905, and the confirmation of April
12, 1905, were entered into with such knowledge. The obliga-
tions of such contract were not made dependent upon the out-
come of Shepherd's appeal. The preamble to the contract of
March 31st recited that Hannah had on February 28th quit-
claimed to Jerry all her interest in her father's "estate." It
further recited that Jerry was to hold the same as security
only for money loaned and obligations incurred in her behalf.
When this contract was made, the interest of Hannah as heir
of her father had been converted by the referees' sale into
personalty or money. At least this was so on April 12th. The
necessary effect of these recitals in the preamble was to entitle
Hannah, as between her and Jerry, to one-sixth of the proceeds
of the referees' sale subject only to the right of Jerry to have
sufficient of the same applied to the extinguishing of her
obligations to him. If any margin were left over and above
such obligation, she would be entitled to the same notwith-
standing her absolute deed of February 28th. To confer that

right upon her, it was not necessary that the contract of March 31st should contain an express agreement to that effect. It was enough that it should expressly acknowledge that the deed was intended as security only. In addition to this, the contract did expressly provide that upon payment of all her obligations to him he would convey to her an undivided one-sixth interest in the ''farm'' then owned by him, in pursuance of the referees' deed. The obligations to him would necessarily include one-sixth of the bid at the referees' sale. The effect of the contract was that, as between them, Jerry was entitled to the repayment of all obligations incurred by him on behalf of Hannah, including one-sixth of the purchase price at referees' sale, and Hannah was entitled to one-sixth the proceeds of the referees' sale (then on deposit in the district court) and to a conveyance from Jerry of one-sixth of the farm. The values to be realized out of the enterprise by the final contract of September 23d were ample to extinguish all of Hannah's obligations so far as they are made to appear in this record, and to leave to her a valuable margin under her contract. The subsequent reversal on Shepherd's appeal was a blow to Hannah and took from her all the proceeds from the referees' sale. But Jerry had no other interest therein than that it reduced his security. If the remaining security was sufficient to meet the obligations due him, his interest in the appeal became nominal only.

To put it in another way, the joint enterprise contemplated a division of the farm, five-sixths to Jerry and one-sixth to Hannah. If the value of the farm had remained constant, Hannah's liability for one-sixth of the purchase price would equal the value of the one-sixth interest in the farm contracted for. She would have no margin in the value of the thing contracted for over her liability for the purchase price. In that sense, her right under the contract would be naked and its value nominal.

Again, if the value of the farm had depreciated, so that her liability under the contract would be greater than the

interest contracted for, her right under the contract would be burdened with a loss and become a liability rather than an asset.

On the other hand, if the value of the farm increased beyond the purchase price, such increase added corresponding value to her right under the contract and gave her a margin of value therein over and above her liability for the purchase price. As already indicated, there was a very substantial increase, and this furnishes the measure of the controversy between the parties.

Jerry suffered no prejudice in fact from the subsequent reversal in this court on Shepherd's appeal, and such reversal furnishes no basis for his affirmative defense of false representation or failure of consideration.

Generally speaking, it may be true, as argued, that if the parties could have foreseen that Hannah would lose her case on appeal, Jerry would never have entered into the enterprise with her, because she would thereby be rendered unable to contribute any capital thereto. But this is only wisdom subsequent. The present might always be wise if the future kept an open door. If these parties could have looked forward to April, 1906, and could thereby have seen the reversal on Shepherd's appeal, they would necessarily have taken April 10, 1905, and September 23d on their way. In such event, Hannah would not have needed Jerry's help, and doubtless would not have assigned her bid; and Jerry would have been poorer for the mutual foresight than he is. He can afford to be grateful that the knowledge of both was meager and that, when his own courage had filled its full measure and had surrendered in the bidding, the unreasoning intuition and unyielding resolution of his sister dragged him, almost terrified, into a victorious enterprise which exceeded his most visionary hopes. If only the brave deserve the fair, there is something due the sister in this case as both brave and fair.

The foregoing presents the controlling facts in the case, and we need not deal further with the many details which are

involved. The record is voluminous and very complicated. It has been laid before us with commendable clearness, and we have thereby had little trouble in getting to the salient facts. There was an accounting had in the trial court. No dispute is presented here upon that branch of the case, and the evidence pertaining thereto is not included in the record before us.

We reach the conclusion that the decree of the trial court was right, and it is, accordingly—*Affirmed.*

LADD, C. J., and WEAVER and PRESTON, JJ., concurring.